CHARLIE HARRISON,

     Plaintiff,

v.

CITY OF ATLANTIC CITY,
MICHAEL OLDROYD, ANTHONY
ALOSI, MICHELLE CLARKE,
REBECCA SEABROOKE, and
BOUNTHAMAL THAVISACK,

     Defendants.

1:14-cv-06292-NLH-AMD

**OPINION**

**APPEARANCES:**

JENNIFER ANN BONJEAN
ASHLEY BLAIR COHEN
BONJEAN LAW GROUP PLLC
1000 DEAN ST.
SUITE 345
BROOKLYN, NY 11238
    On behalf of Plaintiff

A. MICHAEL BARKER
TODD J. GELFAND
BARKER, GELFAND & JAMES
LINWOOD GREENE
210 NEW ROAD
SUITE 12
LINWOOD, NJ 08221
    On behalf of Defendant City of Atlantic City

CHRISTINE P. O'HEARN
WILLIAM F. COOK
SHAWN C. HUBER
BROWN & CONNERY, LLP
360 HADDON AVENUE
PO BOX 539
WESTMONT, NJ 08108
    On behalf of the individual officer Defendants

**HILLMAN**, District Judge

This case involves claims of excessive force by City of Atlantic City police officers, and claims of municipal liability against Atlantic City for its practices and customs which allegedly foster a culture that permits use of excessive force. Presently before the Court are the motions of Defendants for summary judgment in their favor. For the reasons expressed below, Defendants' motions will be denied in part and continued in part.

## BACKGROUND

Plaintiff, Charlie Harrison, alleges the following events that serve as the basis for his Fourth Amendment violation claims against the Defendant police officers and the City of Atlantic City:[1]

During the early morning hours of November 14, 2012, Plaintiff was evicted from the Atlantic Club Casino where he had been playing craps. It is undisputed that Plaintiff was intoxicated when he was escorted from the premises. Atlantic

---

[1] In his complaint, Plaintiff alleged numerous constitutional and state law violations against various Defendants. By way of stipulations of dismissal or concessions in his opposition briefs, the only claims remaining in Plaintiff's complaint are his excessive force claims against the individual officers and his municipal liability claims against Atlantic City.

Club Casino security called the Atlantic City Police Department ("ACPD") to report that Plaintiff was intoxicated and had left the property driving a black Mercedes.

According to Defendant Oldroyd, at approximately 2:07 a.m., he spotted Plaintiff's black Mercedes mini-van which matched the description given out by police communications minutes earlier. After following Plaintiff's car for a period of time with his emergency lights activated, Defendant Oldroyd effectuated a so-called "high risk" stop of Plaintiff's car at Virginia and Pacific Avenues. What transpired after Plaintiff stopped his vehicle is hotly contested.

Plaintiff testified that he was traveling east after turning off Pacific Avenue and was forced to make a U-turn when he reached the boardwalk. After turning around and driving back toward Pacific Avenue, Plaintiff noticed that he was being followed by police vehicles with their emergency lights on. Plaintiff did not hear any sirens and the officers gave conflicting testimony about whether their sirens were on (e.g., Defendant Oldroyd testified that he activated his siren while Defendant Alosi testified that no sirens were activated). According to Plaintiff, after stopping his car at a red light, a male officer walked up to the window and ordered him out of the car. Plaintiff complied with the order and began to walk with

his hands up toward the male officer who was standing in front of his police vehicle parked behind Plaintiff's car. According to Plaintiff, when he reached the male officer, he was punched in the face multiple times by the officer. Plaintiff testified that he was then pulled to the ground by Defendant Clark's K-9 partner who bit him on the back of the knee. When he fell to the ground, a gang of officers assaulted him. Plaintiff testified that he did not resist and did not even defend himself: "When I walked to them, my hands was up. I think they told me to put my hands up. And when I got to them. It was just a punch. Then it was another, and another punch, and I just stood there like a speed bag, and I took punches, and then the dog came, and the dog grabbed me behind the leg and then I fell. And when I fell, the officer fell, and then it was, like, my arm was bent all the way up. And then it was like a knee in my shoulder or something like that. And then it was like a headlock, and then it was, like, more punches. And then I blacked out."

Plaintiff recalls regaining consciousness when he was thrown into the backseat of a police car. Plaintiff recalled hearing some of the officers laughing before he blacked out.

Plaintiff's medical reports and photographs reveal that he suffered significant physical injuries during his arrest.

Plaintiff received medical care at the AtlantiCare Regional
Medical Center immediately after his arrest.  The treating
emergency room physician noted that Plaintiff "sustained injury
to the head, contusion, hematoma, pain, swelling, tenderness,
lateral aspect of left and posterior aspect of left knee,
abrasion, laceration."  The physician further noted deep
lacerations to the posterior aspect of Plaintiff's left leg and
that contusions to his right eye and right side of his face were
"deep" and "severe."  The swelling to Plaintiff's face was so
pronounced that the doctor was unable to assess his eyesight.
In his Atlantic County Justice Facility booking photo,
Plaintiff's face reveals pronounced swelling, bruising, and a
significant abrasion to the right side of his face.  Both of
Plaintiff's eyes are completely shut in his booking photo. (See
Docket No. 146 at 3-5.)

Defendants relate a different version of events.
Defendants contend that Plaintiff failed to adhere to their
signals and continued driving ignoring the clear direction to
pull his care over.  When Plaintiff's vehicle eventually came to
a stop, Defendant Clark, who had also responded to the scene,
pulled alongside Plaintiff's vehicle and ordered him to exit.
After responding in a verbally assaultive and aggressive manner,
Plaintiff exited his vehicle and approached Defendant Oldroyd.

Defendant Oldroyd attempted to handcuff Plaintiff, but Plaintiff pulled away causing both men to fall to the ground. Immediately after hitting the ground, Defendant Oldroyd became incapacitated when he temporarily lost feeling in his right arm. Plaintiff continued to resist and ignored commands of Defendant Oldroyd and additional officers who had arrived to assist. With an incapacitated officer on the ground and a resisting arrestee, Defendant Clark made the split-second decision to utilize her K-9 partner to apprehend Plaintiff. (See Docket No. 133-19 at 2.)

Plaintiff was charged and subsequently indicted for aggravated assault in violation of N.J.S.A. 2C:12-1(b)(5), resisting arrest through physical force or violence in violation of N.J.S.A. 2C:29-2(a)(3)(a), and eluding in violation of N.J.S.A. 2C:29-2(b). Pursuant to a negotiated settlement with the Atlantic County prosecutor, Plaintiff pled guilty to and was convicted of eluding. All other charges were dismissed.

Plaintiff alleges that the defendant officers used excessive force in his arrest in violation of the Fourth Amendment. Plaintiff also contends that Atlantic City is liable under Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 (1978) because Atlantic City has a widespread practice or custom of permitting its officers, including the individual

defendants here, to employ excessive force without fear of discipline.

Defendants have moved for summary judgment on Plaintiff's claims. The individual Defendants argue that they are entitled to qualified immunity on Plaintiff's Fourth Amendment claims because no reasonable jury would conclude that their use of force was not objectively reasonable. Atlantic City argues that it cannot be held liable under Monell because no material disputed facts support Plaintiff's claim that a policy or custom of Atlantic City caused Plaintiff harm. Plaintiff has opposed both motions.

## DISCUSSION

### A.   Jurisdiction

When Plaintiff filed his complaint, he brought his claims pursuant to 42 U.S.C. § 1983, as well as New Jersey state law. Plaintiff's only remaining claims at this point in the case are based on violations of federal law. Consequently, this Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.

### B.   Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by

affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## C. Analysis

Section 1983 is not a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights. Graham v. Connor, 490 U.S. 386, 393-94 (1989). Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged

deprivation was committed or caused by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

## 1. Plaintiff's excessive force claims against the individual officers

For Plaintiff's claims against the individual defendants acting in their personal capacity, the qualified immunity doctrine governs the analysis. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012). In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." <u>Id.</u> It is the defendant's burden to establish entitlement to qualified immunity. <u>Kopec v. Tate</u>, 361 F.3d 772 (3d Cir. 2004).

10

In determining whether excessive force was used in effecting an arrest, the Fourth Amendment's "objective reasonableness" test is applied. Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (relying on Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Id.

Even though the determination of whether an officer acted objectively reasonably or made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury, the Third Circuit has recognized that a judge should not decide the

objective reasonableness issue until all the material historical facts are no longer in dispute.  <u>Curley v. Klem</u>, 499 F.3d 199, 211, 211 n. 12 (3d Cir. 2007).  To do this, "[a] judge may use special jury interrogatories, for instance, to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity."  <u>Id.</u>  In other words, "[w]hen the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity,  . . . but responsibility for answering that ultimate question remains with the court."  <u>Id.</u>

In this case, the Court must deny summary judgment and employ the special interrogatory procedure for the jury to resolve the disputed facts regarding Plaintiff's excessive force claims.  After the Court's review of all the evidence in the record, it is clear that Plaintiff has set forth sufficient disputed material facts to send to a jury as to each officer's use of force in effecting his arrest.

1.    Defendant Officer Thavisack refutes that he struck or kicked Plaintiff, but on his Use of Force ("UOF") police report he checked the box for "compliance hold" and "hands/fists," and

he testified that he assisted the other officers in placing handcuffs on Plaintiff.

2.    Defendant Officer Alosi contends that when he arrived on scene he got out of his vehicle and took cover behind his vehicle. After taking cover, Alosi saw Plaintiff walking towards Oldroyd and, upon reaching him, Oldroyd attempted to place a handcuff on Plaintiff. Once Alosi saw Plaintiff and Oldroyd fall to the ground, he ran to support Oldroyd. When Alosi arrived at the struggle, Oldroyd was on the ground and Alosi placed his left hand on Plaintiffs shoulder and pushed down. At this point Plaintiff opened his mouth and attempted to bite his hand so Alosi had to deliver two strikes to Plaintiff's face in response to Plaintiff's attempt to bite him. Alosi's UOF report checked the box for "hands/fists."

3.    Defendant Officer Seabrook refutes punching or kicking Plaintiff, but she checked the boxes for "compliance hold" and "hands/fists" on her UOF report, and testified that she, with the help of the other officers, completed handcuffing Plaintiff after he was bitten by the K-9.

4.    Defendant Officer Oldroyd was the first officer to make contact with Plaintiff and refutes that he struck Plaintiff in the face, but Oldroyd states that he brought Plaintiff to the ground in an effort to complete handcuffing, they wrestled on

13

the ground, and Oldroyd "went out of the fight" because he had
injured his elbow. Oldroyd checked the boxes for "compliance
hold" and "hands/fists" on his UOF report.

5. Defendant Officer Clark was working the midnight shift
as a K-9 officer and directed her dog to bite Plaintiff on the
leg at some point during the incident.

Defendants contend that they had legitimate reasons for
their interactions with Plaintiff – namely, Plaintiff's
resistance to being arrested – and their use of force was
completely reasonable under the circumstances. They also argue
that because Plaintiff blacked out and does not completely
remember the incident, only their testimony should be credited.

Neither of Defendants' positions is availing. First, a
jury must weigh Plaintiff's testimony and evidence against
Defendants' testimony and evidence to determine what occurred
during the incident. The Court cannot assess the evidence or
the parties' credibility to form a narrative of what happened in
the course of Plaintiff's arrest. The jury must make that
assessment so that the Court may then determine whether the
defendant officers acted in an objectively reasonable manner and
are thus entitled to qualified immunity.

Second, the fact that Plaintiff cannot precisely identify
which officer struck him during his arrest and to what degree is

not fatal to his excessive force claims.  Plaintiff has

demonstrated that each individual officer handled him in some

way, either through their efforts to handcuff him, by striking

him, pressing down on him, or ordering the K-9 to bite him.  A

jury must determine how each defendant handled Plaintiff – in

the manner they admit, in the way Plaintiff describes, or in

another way.  Plaintiff having eyes swollen shut so he could not

see and ultimately losing consciousness as a result of the

officers' use of excessive force, if true, cannot serve to

shield the officers from liability.  Such a standard would be

nonsensical.  See, e.g., Ortiz v. City of Camden, 2015 WL

3603933, at *5 (D.N.J. 2015) (stating that whether the officers

acted in an objectively reasonable manner in their use of force

on the decedent and are therefore entitled to qualified immunity

could only be determined by the Court after a jury resolved the

factual disputes, and that it was particularly necessary in that

case, where the decedent could not provide his own account of

what happened) (citing Tuite v. New Jersey, 2014 WL 5035707, *5

(D.N.J. 2014) (stating that because the alleged victim of

excessive force by a police officer died as a result of the use

of force, and therefore could not testify on his own behalf, the

court was "particularly cognizant" of the duty "to examine all

the evidence in the record  . . . to determine whether the

officer's story is internally consistent and consistent with other known facts") (citing <u>Tofano v. Reidel</u>, 61 F. Supp. 2d 289, 301 (D.N.J. 1999) (<u>Lamont v. New Jersey</u>, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.")) (other citations omitted).

Consequently, whether the officers acted in an objectively reasonable manner in their use of force on Plaintiff – and are therefore entitled to qualified immunity[2] – can only be determined by the Court after a jury resolves the material factual disputes.  The defendant officers' motion for summary judgment must be denied.

## 2. Plaintiff's <u>Monell</u> claims against the City of Atlantic City

Municipalities and other local government units are among those "persons" to which § 1983 liability applies.  <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658, 690 (1978).  Local governments, however, cannot be held liable for the actions of their employees solely based on the doctrine of

---

[2] The parameters of the constitution's prohibition of excessive force are firmly established.  Thus, the only issue for the Court to ultimately determine is whether, as a matter of law, defendants were objectively reasonable with regard to that clearly established right.

*respondeat superior*.  Id. at 691-95; Bielevicz v. Dubinon, 915

F. 2d 845, 849-50 (3d Cir. 1990).  In order to successfully

state a claim for municipal liability, a plaintiff must allege

that the employees' actions were pursuant to a policy or custom

of the municipality itself.  Monell, 436 U.S. at 694; Watson v.

Abington, 478 F.3d 144, 155 (3d Cir. 2007).

To show the existence of a policy or custom under Monell, a

plaintiff must allege that the municipality acted or failed to

act in any one of three ways.  First, the municipality adopted

an official policy that deprives citizens of their

constitutional rights.  Monell, 436 U.S. at 694.  Second, it

tolerated or adopted an unofficial custom that results in the

unlawful stripping of constitutional rights.  Natale v. Camden

County Correctional Facility, 318 F.3d 575 (3d Cir. 2003).

Third, it failed to "train, supervise, or discipline" its

employees so as to prevent them from unlawfully depriving

citizens of their constitutional rights.  City of Oklahoma v.

Tuttle, 471 U.S. 808 (1985).  "A municipality's failure to train

its employees in a relevant respect must amount to 'deliberate

indifference to the rights of persons with whom the [untrained

employees] come into contact.'"  Connick v. Thompson, 131 S. Ct.

1350, 1359 (2011) (citation omitted).

Plaintiff argues that genuine issues of material fact exist as to the following Monell claims: (1) Defendant Atlantic City has a widespread, well-settled practice or custom of permitting its officers, including the individually named officers, to employ excessive force without fear of discipline; (2) Defendant Atlantic City has a widespread, well-settled practice of exonerating rogue officers by failing to meaningfully investigate citizens' internal affairs complaints; (3) Defendant Atlantic City failed to supervise, discipline and train its officers with regard to officers' use of force; (4) Defendant Atlantic City failed to supervise, discipline and train its officers with regard to the appropriate and constitutional use of patrol dogs for so-called criminal apprehension; (5) Defendant Atlantic City has a widespread, well-settled practice of condoning its K-9 handlers' use of patrol dogs to bite non-threatening, non-violent, often impaired petty offenders as a means of gratuitous punishment causing serious and permanently disfiguring injuries; and that (6) this practice is directed overwhelmingly at people of color.

Atlantic City argues that Plaintiff cannot maintain his municipal liability claim for two main reasons. First, Atlantic City argues that Plaintiff's complaint alleges improper "policies," but his purported evidence and arguments to support

his claims only pertain to "customs and practices." Second, Atlantic City argues that even if Plaintiff's complaint can be read to plead allegations of Atlantic City's "customs and practices," Plaintiff's proffered evidence in the form of internal affairs complaints, while provocative, does not connect the required dots – that is, that the Chief of Police knew or acquiesced to insufficient IA investigations, that reports of excessive force have not been investigated, that complaints about an officer's use of force mean that the force was unreasonable, that concerns over a few "rogue" officers renders the IA process a sham, that the Chief knew or should have known about any of these particular officer defendants' propensity to using excessive force, or that the Chief was deliberately indifferent to the need for properly training the officers in the proper use of force.

Before assessing the parties' arguments, the Court questions whether Plaintiff's <u>Monell</u> claims should not be decided until after Plaintiff's excessive force claims are resolved. In <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986), the Supreme Court stated,

> Neither <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury

has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.

The Third Circuit has affirmed the application of <u>Heller</u> in § 1983 cases where the plaintiff alleged constitutional violations against individual police officers and also asserted a claim for municipality liability against the city under <u>Monell</u>. <u>See, e.g.</u>, <u>Smith v. Gransden</u>, 553 F. App'x 173, 178 (3d Cir. 2014) ("Because we will not disturb the jury's verdict that Frampton is not liable for any constitutional violations, there can accordingly be no derivative municipal claim based on Frampton's actions. Further, to the extent that Smith argues that Camden is nevertheless liable under § 1983 because its unwritten policy caused a constitutional violation through officers on the scene other than Frampton, her argument is similarly unavailing, as it requires proof that a CPD officer on the scene violated Kashon Smith's constitutional rights by being deliberately indifferent to his medical needs. Here, the jury found Smith did not prove any officer violated Kashon Smith's rights and thus, Camden could not be found liable and we will not disturb the District Court's ruling in favor of Camden." (internal citations and quotations omitted)); <u>Reiff v. Marks</u>,

511 Fed. App'x 220, 222–23 (3d Cir. 2013) (affirming the
district court's dismissal of the plaintiff's failure-to-train
municipal liability claim against West Reading Borough after a
jury trial determined that the defendant officer's use of a
TASER on the plaintiff was reasonable use of force because a
municipality may not be held liable on a failure to train theory
when a jury has found that the plaintiff has suffered no
constitutional violation).

In this case, if, after a jury has answered its special
interrogatories as to Plaintiff's excessive force claims, the
Court concludes that none of the defendant officers violated
Plaintiff's Fourth Amendment rights and they are entitled to
qualified immunity, the principle announced in Heller and
applied by the Third Circuit would appear to warrant the
dismissal of Plaintiff's municipal liability claims against
Atlantic City.  It would seem to be, at a minimum, a waste of
judicial resources to assess Plaintiff's Monell claims against
Atlantic City now if such claims ultimately may not be viable.
See Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice,
or to expedite and economize, the court may order a separate
trial of one or more separate issues, claims, crossclaims,
counterclaims, or third-party claims.  When ordering a separate

trial, the court must preserve any federal right to a jury trial.").

Accordingly, the Court will direct the parties to show cause as to why Plaintiff's claims against the officers and Plaintiff's claims against Atlantic City should not be bifurcated, where the Court will consider Atlantic City's motion for summary judgment only if Plaintiff prevails on his excessive force claims against at least one defendant officer.

## CONCLUSION

For the reasons expressed above, the motion for summary judgment by the defendant officers on Plaintiff's claims of excessive force must be denied. Atlantic City's motion for summary judgment shall be continued pending the parties' submissions in response to the Court's Order to Show Cause on the issue of whether Plaintiff's claims against the officers and the City should be bifurcated.

An appropriate Order will be entered.


Date: __May 23, 2017____          __ s/ Noel L. Hillman___
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.